**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Slep-Tone Entertainment Corporation,<br>         Plaintiff,<br><br>v.<br><br>Jason Borsom d/b/a LK Entertainment,<br>         Defendant. | Case No.: |

**COMPLAINT**

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned counsel, hereby complains of the Defendant, and for its Complaint alleges as follows:

**JURISDICTION AND VENUE**

1.      This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, and 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.      This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to the Plaintiff's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because the Defendant resides in this State and judicial district.

4.      This Court has personal jurisdiction over the Defendant, in that the Defendant resides in this State and judicial district and conducts significant business here, and in that the acts of which the Defendant stands accused were undertaken in this State and judicial district.

## THE PARTIES

5.     Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Charlotte, North Carolina.

6.     Defendant Jason Borsom ("Borsom") is a natural person who does business under the name "LK Entertainment," and who formerly did business under the name "Liquid Kourage Karaoke."

## BACKGROUND FACTS

7.     Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the trademark SOUND CHOICE.

8.     Slep-Tone is recognized as a leading producer of high-quality karaoke accompaniment tracks and has invested more than $18 million to re-record and replicate the authentic sound of approximately 18,000 popular songs across different eras and genres of music.

9.     Slep-Tone's dedication to producing music of the highest quality and the most authentic character led to its SOUND CHOICE label being the most recognizable and sought-after in the industry.

10.     Throughout its history, Slep-Tone has released its products for commercial use exclusively on physical media—initially, cassette tapes, and then compact discs beginning in approximately 1994.

11.     Originally, Slep-Tone's compact discs contained karaoke tracks encoded in a special format known as "CD+G," or "compact disc [audio] plus graphics," that allows for synchronized playback of audio and video suitable for prompting singers with lyrics cues.

12.     CD+G discs required special players that were capable of decoding the CD+G format.

13.     More recently, computer technology that allows the karaoke tracks stored on compact discs in CD+G format to be decoded and "ripped" (copied) to a computer hard drive has become widely available.

14.     Copies of karaoke tracks stored on media other than the original compact discs are referred to as "media-shifted copies" because they have been duplicated from the original media and written to non-original media.

15.     Media-shifting also frequently involves format-shifting, the conversion from the original format (such as CD+G) to another format (such as MP3+G or WAV+G).

16.     As the price of computer hard drives of ever-larger size has fallen, professional users now have the technical ability to store a large number of karaoke accompaniment tracks on hard drives for convenient transport to their karaoke shows, without also carrying large numbers of compact discs.

17.     As a result, most professional karaoke operators have shifted to the use of ripped karaoke tracks stored on computer media such as hard drives as a matter of convenience.

18.     However, the same technology is capable of being used not only for convenience but also to allow—on a technical level—the operator to use more music than he or she has paid for and, in some cases, to avoid paying for music at all.

19.     Karaoke operators have used the available technology to copy one purchased disc to two or more computer systems for simultaneous use; to copy their patrons' discs to the operator's computer hard drive at a show; to "swap" song files with other operators; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that

were pre-loaded with copies of karaoke tracks; and to sell off their original media in the secondary market once they have ripped those media to a hard drive.

20.     The foregoing activities nearly drove Slep-Tone out of business because it became relatively easy to obtain, free or at a nominal cost, illicit copies of products that would cost tens of thousands of dollars if purchased at retail.

21.     Historically, Slep-Tone opposed the shifting of SOUND CHOICE karaoke tracks to alternative media, warning purchasers of CD+G discs that unauthorized copying was a violation of applicable laws.

22.     More recently, however, Slep-Tone established a media-shifting policy ("MSP") that imposes mandatory rules for karaoke operators who use media-shifted copies of SOUND CHOICE karaoke tracks to provide commercial karaoke services.

23.     Briefly stated, the MSP requires compliance with four conditions: (a) 1:1 ("one-to-one") correspondence, meaning that for every media-shifted SOUND CHOICE karaoke track on a given medium such as a computer hard drive, the operator owns and maintains possession of a lawful original SOUND CHOICE karaoke track on its original medium, on a one-copy-for-one-original basis; (b) that the original media that form the basis for 1:1 correspondence are placed "on the shelf," i.e., not used for any purpose at all; (c) that the operator notify Slep-Tone that he or she has media-shifted karaoke tracks; and (d) that the operator submit to and be certified as having passed an audit of the operator's systems to verify complete compliance with the MSP.

24.     The basis of Slep-Tone's authority to require compliance with the MSP is its right to control the commercial use of its federally registered trademarks and, as to some tracks, its

ownership of copyright in the synchronized audiovisual words represented by and in the sound recordings associated with those tracks.

25.     If an operator complies with all four conditions of the MSP, then that operator is granted permission from Slep-Tone, co-extensive only with Slep-Tone's rights in the subject matter, to use the media-shifted copies to provide commercial karaoke services.

26.     If an operator fails to comply with any of the conditions of the MSP, then none of the media-shifting the operator has conducted is permitted, authorized, or tolerated by Slep-Tone.

## THE RIGHTS OF THE PLAINTIFF

27.     Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

28.     Plaintiff Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

29.     Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725,



issued September 17, 1996, and renewed once, for a display trademark as follows:

for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

30.     Plaintiff Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

31.     Slep-Tone has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendant, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

32.     Principally, the Sound Choice Marks are indicators of Slep-Tone as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Slep-Tone or at its direction and under its control.

33.     Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the Sound Choice Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

34.     Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

35.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

36.     The aforementioned trade dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by this Defendant are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

37.     The elements of the Trade Dress represent specific design choices by the Plaintiff; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

38.     No competitor of Slep-Tone is required to use any element of the Trade Dress to accomplish the cueing function, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the cueing function.

## ACTIVITIES OF BORSOM

39.     Borsom provides karaoke services to various venues in Illinois, principally concentrated in the Chicago metropolitan area.

40.     In order to provide services, rather than using original karaoke discs that he possesses (if he indeed possesses such discs), Borsom relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

41.     Upon information and belief, Borsom relies upon at least two such computer hard drives that are substantially identical in content.

42.     Borsom created, or directed another to create, or otherwise acquired from a third party the files that are stored on his computer hard drives.

43.     Borsom does not maintain a 1:1 correspondence relationship between his hard drives and original discs he has lawfully acquired.

44.     Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Borsom's computer hard drives at the time those files were so stored.

45.     Rather, the files were created by or at the behest of Borsom, or by a third party unknown to Slep-Tone.  The party who created the files is the "origin" of the files for purposes of the Trademark Act.

46.     Many of the files stored on Borsom's computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the Sound Choice Marks.

47.     When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

48.     Slep-Tone did not authorize Borsom to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

49.     As such, the placement of the Sound Choice Marks and the Trade Dress upon Borsom's self-created computer files is a false designation of the origin of those computer files.

50.     At all times relevant to the causes of action stated herein, Borsom has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

51.     Borsom's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

52.     A patron or unwitting customer of Borsom, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of Borsom's shows, is likely to be confused into believing, falsely, that Slep-Tone created the tracks in use or authorized their creation.

53.     Borsom's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because he is paid to provide access to and play those computer files and tracks at karaoke shows.

54.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Borsom is compensated and which inures to his benefit.

55.     Borsom's piracy of accompaniment tracks is not limited to Slep-Tone's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

## ACTIVITIES OF NON-PARTY BARS AND RESTAURANTS

56.     Various non-party bars and restaurants have hired Borsom to provide commercial karaoke services at their establishments.

57.     These non-parties have not been added to this pleading, though Plaintiff reserves the right to amend to add these potential defendants in due course in a manner consistent with the Federal Rules of Civil Procedure.

58.     The non-party bars and restaurants have engaged Borsom to provide karaoke services at their establishments, or retained Borsom as a provider at their establishments, having been notified and therefore knowing that Borsom is engaged in trademark infringement and unfair competition while providing those services.

59.     The non-party bars and restaurants each have the ability to control whether or not Borsom engages in trademark infringement and unfair competition when providing karaoke services at their establishments.

60.     These bars and restaurants have received a financial benefit from the provision of infringing karaoke services at their establishments by Borsom, through the attraction of paying patrons to their establishments.

61.     As such, each of the bars and restaurants related to these allegations are operating in actual or apparent partnership with Borsom, in a symbiotic relationship from which both benefit.

62.     Each of the bars and restaurants are liable for the acts of trademark infringement directly engaged in by Borsom on their respective premises or for their benefit.

## DAMAGES

63.     The Defendant's unauthorized use of the Slep-Tone's trademarks has damaged Slep-Tone.

64.     Defendant Borsom has damaged Slep-Tone in an amount to be proven at trial but not less than $25,000 for each karaoke system they own or operate and which contains karaoke tracks that infringe the Sound Choice Marks as detailed above, based upon their foregone purchases of original media.

65.     Defendant Borsom has also enjoyed years of revenues attributable in substantial part to his use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

66.     Borsom's illicit activities have also allowed him to compete unfairly against Slep-Tone's legitimate customers by lowering his cost of doing business through piracy of the music materials he uses.

67.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Borsom operates by helping to crowd higher-cost but legitimate operators out of the market.

68.     The Defendant's acts deprived Slep-Tone of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**

69.     Defendant Borsom used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

70.     Use of the Sound Choice Marks and the Trade Dress by Defendant Borsom was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

71.     Slep-Tone did not license Borsom to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of their services.

72.     Use of the Sound Choice Marks and the Trade Dress by Borsom in this manner is likely to cause confusion, or to cause mistake, or to deceive their customers and patrons into

believing that their services are being provided with the authorization of Slep-Tone and that their music libraries contain bona fide Sound Choice accompaniment tracks.

73.     The acts of Borsom were willful, knowing, and intentional.

74.     Slep-Tone has been damaged by these infringing activities.

75.     Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**

76.     On each occasion when they caused or permitted an unauthorized counterfeit duplicate of a Slep-Tone accompaniment track to be played during a karaoke show at a given establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with the Defendant's karaoke services.

77.     The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendant's services and commercial activities.

78.     The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased or otherwise licensed by the Defendant.

79.     The Defendant's use of Slep-Tone's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of Slep-Tone if the Defendant had

legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

80.     Because Slep-Tone has been denied this revenue, it has been damaged by the Defendant's uses.

81.     On each occasion when the Defendant caused or permitted an accompaniment track pirated from a manufacturer other than Slep-Tone to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the Defendant's karaoke services.

82.     Upon information and belief, the Defendant's use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact the Defendant or an upstream but unauthorized provider of the track was the origin of that track.

83.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that the Defendant acquired in a legitimate manner.

84.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by the Defendant.

85.     The Defendant's use of the false designations of origin in this fashion damages Slep-Tone by enabling the Defendant to provide or obtain karaoke services at a lower cost than persons who acquire those materials legitimately, including Slep-Tone's legitimate customers, can provide or obtain them.

86.     The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

87.     Because Slep-Tone has been denied this revenue, it has been damaged by the Defendant's false designations of origin relating to other manufacturers.

88.     Unless enjoined by the Court, the Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Slep-Tone prays for judgment against the Defendant, and that the Court:

A.     Find that the Defendant has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.     Find that each of Defendant has engaged in unfair competition detrimental to Slep-Tone in violation of 15 U.S.C. § 1125(a);

C.     Enter judgment against each of Defendant and in favor of Slep-Tone on all applicable counts;

D.     Find the that Defendant's activities were in all respects conducted willfully and for profit;

E.     Award to Slep-Tone the Defendant's profits and the damages sustained by Slep-Tone because of the Defendant's conduct in infringing the Sound Choice Marks, the Sound Choice Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $25,000 for each karaoke system operated by the Defendant;

F.      Award to Slep-Tone the Defendant's profits and the damages sustained by Slep-Tone because of the Defendant's acts of unfair competition under 15 U.S.C. § 1125(a);

G.      Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for the Defendant's acts of willful infringement;

H.      Order all computer disks, drives, or other media belonging to the Defendant, which media contain counterfeits of Slep-Tone's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.      Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by the Defendant;

J.      Grant Slep-Tone preliminary and permanent injunctive relief against further false designations of origin by the Defendant with respect to words, names, and symbols associated with other manufacturers;

K.      Award Slep-Tone its costs of suit and attorney's fees, to the extent not awarded above; and

L.      Grant Slep-Tone such other and further relief as justice may require.

Respectfully submitted this the 5th day of March, 2013.

Respectfully Submitted,

/s/ Vivek Jayaram, Esq.

Vivek Jayaram, Esq.
Jayaram Law Group, Ltd.
33 N. LaSalle Street
Suite 2900
Chicago, IL 60602
vivek@jayaramlaw.com
Tel: 312.454.2859
Fax: 312.551.0322
Counsel for the Plaintiff

Of counsel:
James M. Harrington, Esq.
Harrington Law, P.C.
5960 Fairview Road, Suite 400
Charlotte, NC 28210-3119